**JUDGE HELLERSTEIN**

08 CV 6491

NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiff*
*120 Greenwich Development Associates, L.L.C.*
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
Tel:     (212) 220-3830
Fax:    (212) 220-3780
Email:   jnicoletti@nicolettihornig.com



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

120 GREENWICH DEVELOPMENT
ASSOCIATES, L.L.C.,

                           Plaintiff,

      - against -

ADMIRAL INDEMNITY COMPANY and
TIG INSURANCE COMPANY,

                       Defendants.

------------------------------------------------------------X

Case No.:

**DECLARATORY**
**JUDGMENT COMPLAINT**

Plaintiff     120     GREENWICH     DEVELOPMENT     ASSOCIATES,     L.L.C.

("GREENWICH") by its attorneys Nicoletti Hornig & Sweeney, as and for a Complaint against

the     Defendants,     ADMIRAL     INDEMNITY     COMPANY     ("ADMIRAL")     and     TIG

INSURANCE COMPANY ("TIG"), alleges upon information and belief as follows:

## JURISDICTION

1.     This action is filed under and pursuant to the Federal Declaratory Judgment Act,

28 U.S.C. §2201.

2.     A substantial controversy of sufficient immediacy and reality exists between

Plaintiff and Defendants involving the declination of coverage by Defendants under certain

Commercial General Liability insurance contracts and depending on the construction of said contracts, the aforesaid controversy can be determined by a judgment of this Court, without further suit.

3.    This Honorable Court has original jurisdiction over this insurance coverage dispute pursuant to 28 U.S.C. §1332, inasmuch as there is complete diversity of citizenship between the Plaintiff and the Defendants and the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

## VENUE

4.    Venue is proper pursuant to 28 U.S.C. § 1391(b), inasmuch as a substantial part of the events or omissions giving rise to the Plaintiff's claim occurred in this judicial district.

## PARTIES

5.    At all times relevant, Plaintiff GREENWICH was and is a corporation duly organized under and existing by virtue of the laws of the state of New York with an office and principal place of business at 330 Lexington Avenue, 17th Floor, New York, New York 10168.

6.    At all times relevant, GREENWICH was the owner of 120 Greenwich Place, located in New York City, New York.

7.    At all times relevant, Defendant ADMIRAL was and is a corporation duly organized and existing under the laws of the state of Delaware with an office and principal place of business at 1255 Caldwell Road, Cherry Hill, New Jersey, 98034.

8.    At all times relevant, Defendant TIG was and is a corporation duly organized and existing under the laws of the State of California with an office and principal place of business at 5205 N. O'Connor Boulevard, 2nd Floor, Irving, Texas, 75015.

9.    At all times relevant, an entity by the name of Clermont Specialty Managers, Ltd. ("Clermont") was and is the agent and/or representative of ADMIRAL. Clermont is not a party to this action.

10.    At all times relevant, an entity by the name of Riverstone Claims Management, LLC ("Riverstone") was and is the agent and/or representative of TIG. Riverstone is not a party to this action.

11.    ADMIRAL issued a package Commercial Lines Policy providing Commercial Property coverage, General Liability coverage, Commercial Crime coverage, Commercial Inland Marine coverage, Commercial Automobile coverage, Directors and Officers Liability coverage, Employee Benefit Liability coverage and Commercial Umbrella coverage to GREENWICH under Policy No. 21-2-3243-31-02 for the period June 1, 2001 through June 1, 2002 (the "ADMIRAL Policy").

12.    TIG issued Umbrella Policy No. XLB38863588 (hereinafter the "Umbrella Policy") to GREENWICH as an additional insured for the period December 10, 2000 through December 10, 2001.

13.    TIG also issued an Excess Umbrella Policy No. XLX38863589 (hereinafter the "Excess Umbrella Policy") to GREENWICH as an additional insured for the period December 10, 2000 through December 10, 2001.

## UNDERLYING ACTION

14.    This action arises out of the Defendants' wrongful refusal to fulfill their duty to defend and indemnify the Plaintiff pursuant to the terms and conditions of their respective Commercial General Liability insurance policies in connection with the litigation in the United States District Court for the Southern District of New York captioned *Barragan v. 160 Water*

3

*St., Inc. et al.*, assigned index number 1:07-CV-01469-AKH (*see* Docket No. 1, Complaint (hereby incorporated by reference)) and *Castro v. 100 Church Street et al.*, assigned index number 1:07-CV-08279-AKH (*see* Docket No. 1, Check-Off Complaint (hereby incorporated by reference)), and consolidated with *In Re World Trade Center Lower Manhattan Disaster Site Litigation*, assigned index number 1:21-MC-00102-AKH (collectively hereinafter sometimes referred to as the "Underlying Action").

15.     The Underlying Action alleges five (5) separate causes of action against owners of numerously identified buildings, including 120 Greenwich Place, which were located in the area that was allegedly affected by and following the collapse of the Twin Towers (the lower Manhattan disaster site) on September 11, 2001.

16.     Although at all times relevant, GREENWICH was the owner of 120 Greenwich Place, the Underlying Action incorrectly identified Senex Greenwich Realty Associates ("Senex") as the owner.

17.     Although GREENWICH has not yet been named as a defendant in the Underlying Action, both ADMIRAL and TIG have declined coverage, based on the allegations in the Underlying Action.

18.     Defendant ADMIRAL has advised GREENWICH that it has no duty to defend and to indemnify GREENWICH in the Underlying Action.

19.     Defendant TIG has advised GREENWICH that it has no duty to defend and to indemnify GREENWICH in the Underlying Action.

20.     The Underlying Action alleges, among others, the following acts or omissions against the defendants in the Underlying Action:

¶ 1.    Plaintiff brings this action against the Defendants, as specified herein, seeking redress for injuries they have suffered in the past, and will continue to suffer, as a result of the Defendants' reckless, grossly negligent, and negligent ownership operation, leasing, maintenance, control, conduct, supervision, and management of the premises or place of business or work performed at same, and known as and/or located at: as specified herein, all in the City, County and State of New York, (hereinafter referred to as "the locations,") which were effected by and following the terrorist attacks of September 11, 2001, said area designated herein as the Lower Manhattan Disaster Site.    The Defendants are the owners or/their agents, operators, lessees, contractors or/their agents, managers, agents, insurers, permittees, and or/their employees and/or agents, and did own, operate, lease, manage, maintain, and/or control certain buildings in the Lower Manhattan Disaster Site, and/or who performed work and/or entered into agreements relative to certain work, labor and services such as cleanup, repairs, demolitions, construction and excavation of buildings in the Lower Manhattan Disaster Site.

¶ 2.    Because of the collapse of the World Trade Center from damage sustained in the attacks, the Twin Towers and Seven World Trade Center collapsed, spreading known and unknown toxic substances throughout the World Trade Center Site and the surrounding areas, in the Lower Manhattan Disaster Site, including "the locations," portions of which, while owned, operated, leased, maintained, controlled, supervised, and managed by the Defendants, remained dangerous, defective, hazardous, toxic, unguarded, unsupervised, and unprotected for multiple days, weeks, and/or months thereafter.    The Plaintiff participated in clean-up, construction, demolition, excavation, and/or repair, of the "locations" on or about or following September 11, 2001, and during the days, weeks and/or months that followed, and/or as specified in the Plaintiff-Specific Complaint by Adoption.

¶ 3.    The nature of this action is to recover money damages for the personal injuries, pain and suffering, loss of income, loss of services (where applicable), wrongful death (where applicable) and other damages sustained by the Plaintiff as a result of the carelessness, recklessness and negligence of the Defendants, their agents, servants and/or employees, in

failing to provide the Plaintiff with proper and appropriate respiratory protection and protection from exposure to toxins during the time that the Plaintiff participated in the clean-up, construction, demolition, excavation, and/or repair, at the buildings and/or place of business known as and/or located at the "locations," that commenced on or about or following September 11, 2001, and continued for many days, weeks, and/or months thereafter, and or as specified in the Plaintiff-Specific Complaint by Adoption.

\* \* \*

¶ 5.    The Plaintiff also seeks recovery for Defendants' failure to provide proper and appropriate respiratory protection and proper and appropriate protective clothing and equipment; and for failing to properly monitor air quality; and for failing to properly notify him/her of the dangerous levels of toxins and contaminants in the air in, at and/or around the buildings and/or place of business known as and/or located at the "locations;" and for the Defendants' failure to comply with the provisions of the Labor Law of the State of New York, Sections 200 and 241(6), and the New York State Industrial Code and the requirements of the Occupational Safety & Health Administration and other applicable federal, state and local statutes, law, rules, regulations and ordinances.

¶ 6.    As a result of the foregoing, and at all relevant times, the Plaintiff was exposed to toxins, contaminants and other harmful airborne products such as fiberglass, glass, silica, asbestos, lead, benzene, organic matter, and other hazardous chemicals, substances and elements in, at and/or around the buildings and/or place of business known as and/or located at the "locations." In consequence of said exposure (as referenced above and herein), the Plaintiff was injured, said injury being serious and permanent.

\* \* \*

¶ 57.   On or about and/or following September 11, 2001, Defendants, their servants, agents, lessees, permittees, contractors and/or employees, maintained the work site, the "Work" and/or the apparatus provided and utilized in connection with the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 58.   On or about and/or following September 11, 2001, Defendants, their servants, agents, lessees, permittees, contractors and/or employees, supervised the work site, the "Work" and/or the apparatus provided and utilized in connection with the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 59.   On or about and/or following September 11, 2001, Defendants, their servants, agents, lessees, permittees, contractors and/or employees, managed the work site, the "Work" and/or the apparatus provided and utilized in connection with the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 60.   On or about and/or following September 11, 2001, Defendants, their servants, agents, lessees, permittees, contractors and/or employees, controlled the work site, the "Work" and/or the apparatus provided and utilized in connection with the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 61.   At all relevant times, it was the duty of Defendant, their servants, agents, lessees, permittees, contractors and/or employees to maintain and/or supervise and/or manage and/or control the work site, the "Work" and/or the apparatus provided and utilized in connection with the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations," in reasonably safe and suitable condition and repair.

¶ 62.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, monitored the air quality at the said work site, and ignored the findings indicative of toxic contamination and/or improperly interpreted said findings in connection with the "Work" on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 63.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, improperly monitored the air quality at the said work site in connection with the "Work" on the

certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 64.    On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to monitor the air quality at the said work site in connection with the "Work" on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 65.    On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to obtain air quality monitoring independent of any monitoring by any City, State, or Federal agency at the said work site in connection with the "Work" on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 66.    At all relevant times, it was the duty of Defendant, their servants, agents, lessees, permittees, contractors and/or employees, to properly monitor the air quality at the work site, at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations," in reasonably safe and suitable manner, utilizing appropriate equipment for such and to maintain such in proper working and calibrated condition.

¶ 67.    At all relevant times, it was the duty of Defendant, their servants, agents, lessees, permittees, contractors and/or employees, to properly obtain air quality monitoring independent of any monitoring by and City, State, or Federal Agency at the work site, at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations," in reasonably safe and suitable manner, utilizing appropriate equipment for such and to maintain such in proper working and calibrated condition.

¶ 68.    At all relevant times, in accordance with the Labor Law of the State of New York and other applicable city state and federal statutes, law, rules and regulations, it was the duty of the Defendant, its servants, agents, lessees, permittees, contractors and/or employees, to provide for the safety, protection and well-being of persons lawfully working and performing the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 69.   At all relevant times, in accordance with the Labor Law of the State of New York and other applicable city state and federal statutes, law, rules and regulations, it was the duty of the Defendant, its servants, agents, lessees, permittees, contractors and/or employees, to provide a reasonably safe place to work for persons lawfully performing the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

* * *

¶ 71.   At all relevant times, in accordance with the Labor Law of the State of New York and other applicable city state and federal statutes, law, rules and regulations, it was the duty of the Defendant, its servants, agents, lessees, permittees, contractors and/or employees, to provide, furnish and/or ensure the use of safe, suitable and adequate equipment, safety devices and/or apparatus for persons lawfully performing the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

* * *

¶ 78.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to provide the Plaintiff with the proper equipment in order to protect him/her from the effects of toxic smoke, dust and other harmful products and/or other airborne contaminants present at the said work site on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 79.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to provide the Plaintiff with the proper equipment including appropriate respirators and safety clothing in order to protect him/her from the effects of toxic smoke, dust and other harmful products and/or other airborne contaminants present at the said work site on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 80.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to provide the Plaintiff with the proper fitting equipment in order to protect him/her from the effects of toxic smoke, dust and other harmful products and/or other airborne contaminants present at the said work site on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 81.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to properly fit test and continue to fit test any equipment which may have been provided to Plaintiff in order to protect him/her from the effects of toxic smoke, dust and other harmful products and/or other airborne contaminants present at the said work site on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 82.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to monitor the Plaintiff to ensure the use and/or proper use of equipment in order to protect him/her from the effects of toxic smoke, dust and other harmful products and/or other airborne contaminants present at the said work site on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 83.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to monitor the Plaintiff to ensure the use and/or proper use of equipment including appropriate respirators and safety clothing in order to protect him/her from the effects of toxic smoke, dust and other harmful products and/or other airborne contaminants present at the said work site on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 84.   On or about and/or following September 11, 2001, Defendants, their servants, agents, permittees, contractors and/or employees, failed to properly monitor the air quality at the said work site on the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 85.    On or about and/or following September 11, 2001, there existed dangerous, defective, hazardous, unguarded, unsupervised, unprotected, uncontained, and unsafe toxic conditions at the said work site at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

¶ 86.    At all relevant times, Defendants, their servants, agents, permittees, contractors and/or employees, failed to maintain the said work site, the "Work" and/or the apparatus provided and utilized in connection with the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations" in reasonably safe and suitable condition and repair.

¶ 87.    The Defendants negligently collected information necessary for the enforcement of health and safety laws, rules and regulations at the "locations." The Defendants were responsible to inspect and/or negligently inspected their work and the work site "locations" to determine safety conditions and enforce compliance with providing personal protective equipment.

* * *

¶ 90.    The Defendants owed a legal, non-delegable duty to comply with all federal, state and local, laws, statues, standards, regulations, codes, and the ensure that workers were provided with a safe and healthy work environment.

* * *

¶ 94.    The Defendants violated 12 NYCRR 23-1.5(a) in that: all places where workers or persons are suffered or permitted to perform work of any kind in construction, demolition or excavation operations shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection for the lives, health and safety of such persons as well as of persons lawfully frequenting the area of such activity.    To this end, all the Contractors, employers, owners, contractors and their agents and other persons are obligated by law to provide safe working conditions, personal protective equipment and safe places to work for persons employed in contraction, demolition or excavation operations and to protect persons lawfully

frequenting the areas of such activity and shall provide or cause to be provided the working conditions, safety devices, types of construction, methods of demolition and of excavation and the materials, means, methods and procedures required by this part. No employer shall suffer or permit an employee to work under working conditions which are not in compliance with the provisions of this Part or to perform an act prohibited by any provisions of this Part.

\* \* \*

¶ 99.    At all relevant times, in violation of the Labor Law of the State of New York and other applicable city, state and federal statutes, law, rules and regulations, Defendants, their servants, agents, permittees, contractors and/or employees, failed to provide, furnish and/or ensure the use of safe, suitable and adequate equipment, protective devices and/or apparatus for persons lawfully performing clean-up, construction, demolition, excavation, and/or repair operations in performance of the "Work" at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations," including the Plaintiff.

\* \* \*

¶ 107.    Plaintiff breathed in, ingested, came into contact with and/or absorbed said toxins, contaminants and other harmful airborne products during the entire time he/she performed clean-up, construction, demolition, excavation, and/or repair operations and worked at the aforementioned "locations," thus sustaining injury during the entire period of his/her employment activities at said locations.

\* \* \*

¶ 111.    By reason of the foregoing, the Plaintiff was, at all relevant times, exposed to toxins, contaminants and harmful products and/or other harmful airborne products such as fiberglass, glass, silica, asbestos, lead, benzene, organic matter, and other hazardous chemicals, substances and elements at the certain premises and buildings, or a portion thereof, located in lower Manhattan at the "locations."

\* \* \*

¶ 146. The Defendants violated their obligations under Section 214(6) of the Labor Law by failing to ensure that persons frequenting the premises or performing the work at the "locations," were provided with a worksite that was so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to such persons. As a result, the Plaintiff was exposed to toxins, contaminants and other harmful products and was injured.

### ADMIRAL GENERAL LIABILITY POLICY

21.    The General Liability coverage section of the ADMIRAL Policy provides the following relevant coverages to GREENWICH:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.    **Insuring Agreement**
   a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages...

* * *

   b.    This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

* * *

**SECTION V - DEFINITIONS**

13

* * *

3.      "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

* * *

13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

22.     The General Liability coverage section of the ADMIRAL Policy provided a $2,000,000.00 general aggregate limit of liability and a $1,000,000.00 per occurrence limit of liability.

23.     By letters dated August 3 and October 5, 2007, Clermont as the agent and/or representative of ADMIRAL acknowledged timely tender of the defense and receipt of the master complaint and the check-off complaints from GREENWICH under and pursuant to the ADMIRAL-issued Policy number 21-2-3243-31-02.

24.     In the August 3 and October 5, 2007 letters, Clermont took the following coverage position as the agent and/or representative of ADMIRAL:

> We have considered the allegations set forth in the Master complaint and the individual check-off complaint and have determined that the claims are not covered under your comprehensive general liability insurance policy (CGL policy). Accordingly, ADMIRAL Indemnity Company disclaims coverage, and will not defend or indemnify you with respect to any judgment obtained against you or any settlement made with the claimants.

25.     By letters dated October 15 and 16, 2007, Plaintiff GREENWICH by and through its attorneys Nicoletti Hornig & Sweeney, demanded a retraction of ADMIRAL's wrongful coverage position and further demanded that ADMIRAL acknowledge its duty to defend and to indemnify GREENWICH under the ADMIRAL Policy.

26.    By letter dated January 21, 2008, the law firm of Burns, Russo, Tamigi &

Reardon, LLP acting on behalf of ADMIRAL, restated ADMIRAL's wrongful coverage

position as follows: "ADMIRAL Indemnity Company reiterates its disclaimer, and will not

defend or indemnify 120 Greenwich Development Association, LLC as to the claims of

Mr. Barragan."

**TIG UMBRELLA POLICY NO. XLB38863588**

27.    The Umbrella Policy provided the following coverages:

**SECTION I**
**INSURING AGREEMENTS**

**A.    COVERAGE**

WE will pay on YOUR behalf all sums that YOU shall become
legally obligated to pay as damages because of PERSONAL
INJURY, PROPERTY DAMAGE or ADVERTISING INJURY,
caused by an OCCURRENCE to which this policy applies during
this POLICY PERIOD.  The OCCURRENCE must take place in
the COVERAGE TERRITORY.

**B.    LIMITS OF INSURANCE**

The Limits of Insurance shown in the Evidence of Insurance issued
to each "Purchasing Group Member" attached to this policy apply
separately to that "Purchasing Group Member".  The Limits of
Insurance in the Evidence of Insurance attached to this Master
policy and the rules below fix the most we will pay under a single
Evidence of Insurance regardless of the number of:

a.    Insureds;
b.    Claims made or "suits" brought; or
c.    Persons or organizations making claims or bringing "suits"

The remainder of the Limits of Insurance rules apply separately to
each "Purchasing Group Member" shown in the Evidence of
Insurance attached to this policy.

1.    WE shall be liable for that portion of the ULTIMATE NET
LOSS in excess of:

15

a.  the applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not) or;

b.  With respect to an Occurrence for which no Underlying Insurance applies and to which this policy applies, the greater of either:

1.  The applicable limit or limits of any OTHER INSURANCE available to YOU, or

2.  The amount stated in the Declarations as the INSURED'S RETAINED LIMIT.

The total limits of OUR liability under a single Evidence of Insurance for ULTIMATE NET LOSS resulting from any one OCCURRENCE shall not exceed the amount stated as the each OCCURRENCE limit in the Declarations.

Subject to the provisions respecting any one OCCURRENCE, when the underlying policies listed in the Schedule of UNDERLYING INSURANCE or any OTHER INSURANCE available to you and to which this policy applies provide coverage(s) which are subject to an aggregate limit of liability for all covered damages, OUR liability shall likewise be limited to the amount stated in the Declarations as the aggregate limit for ULTIMATE NET LOSS arising out of one or more OCCURRENCES while this policy is in force commencing from its effective date. If the aggregate limits of liability under any UNDERLYING INSURANCE are reduced or exhausted solely by reason of losses paid thereunder arising out of an OCCURRENCE which takes place during OUR POLICY PERIOD, then this policy shall:

1.  in the event of reduction, pay the excess of reduced underlying limits;

2.  in the event of exhaustion, continue in force as UNDERLYING INSURANCE.

The aggregate limit of this policy shall apply separately to (i) the PRODUCTS-COMPLETED OPERATIONS HAZARD as defined in this policy (ii) any other coverage in which the UNDERLYING INSURANCE provides an aggregate limit. If the UNDERLYING INSURANCE does not provide an aggregate limit for coverage(s), OUR liability for ULTIMATE NET LOSS does not provide an

aggregate limit for coverage(s), OUR liability for ULTIMATE NET LOSS (except for the PRODUCTS-COMPLETED OPERATIONS HAZARD as referred to in "i" above) is likewise not subject to an aggregate limit for all insured damages for such coverage(s).

The limits of insurance apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the POLICY PERIOD shown in the Declarations.  Should the POLICY PERIOD be extended after the policy effective date for an additional period of less than twelve (12) months, the annual aggregates will be increased in proportion to the policy extension.

\* \* \*

J.     OCCURRENCE means:
(1)     An accident, including continuous or repeated exposure to substantially the same general harmful conditions that results in "Bodily Injury" or "Property Damage" that is not expected or not intended by the "Insured".

All damages that arise from continuous or repeated exposure to substantially the same general conditions are considered to arise from one "Occurrence".

\* \* \*

M.     PERSONAL INJURY means:
1.     Bodily injury, sickness or disease sustained by a person including death resulting from any of these at any time;

\* \* \*

T.     ULTIMATE NET LOSS means that amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the INSURED is liable, either by adjudication or compromise with the written consent of US, after making proper deduction for all recoveries and salvages.

U.    UNDERLYING INSURANCE means the policy or policies of insurance as described in the Schedule of UNDERLYING INSURANCE forming a part of this policy.

28.    The TIG Umbrella Policy provided a $10,000,000.00 per occurrence limit of liability, in excess of the underlying insurance limit of $1,000,000.00 per occurrence.

29.    By letter dated November 2, 2007, Riverstone, on behalf of, and as the agent and/or representative of TIG, declined coverage to GREENWICH under the Umbrella Policy and stated that "TIG has no duty to defend or obligation to indemnify 120 Greenwich Development Associates."

### TIG EXCESS UMBRELLA POLICY

30.    The Excess Umbrella Policy provided the following coverages:

### SECTION I
### INSURING AGREEMENTS

**A.    COVERAGE**

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance or losses arising out of occurrences insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than exhaustion of an aggregate limit of insurance, than WE shall not pay such loss.

The Definitions, Terms, Conditions, Limitations, and Exclusions of the "first policy of UNDERLYING INSURANCE", in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provision of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.

* * *

18

**SECTION III**
**DEFINITIONS**

B.     ULTIMATE NET LOSS means the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with the written consent of US, after making proper deduction for all recoveries and salvages. Defense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE.

C.     UNDERLYING INSURANCE means the policy or policies of insurance as described in the Declarations and Schedule of Underlying Insurance forming a part of this policy.

D.     WE, US and OUR means the company shown in the Declarations as providing this insurance.

E.     YOU and YOUR means a person or organization who qualifies as an insured in all of the underlying policies.

31.     The TIG Excess Umbrella Policy provided $15,000,000.00 per occurrence limit of liability, in excess of the underlying insurance limit of $10,000,000.00 per occurrence.

32.     By letter dated December 19, 2007, Riverstone, on behalf of, and as the agent and/or representative of TIG, declined coverage to GREENWICH under the Excess Umbrella Policy, and stated that "TIG has no duty to defend and/or obligation to indemnify GREENWICH Development."

**AS AND FOR A FIRST CAUSE OF ACTION**

33.     Repeats and realleges each and every allegation set forth in paragraphs 1 though 32, inclusive of this Declaratory Judgment Complaint with the same force and effect as if more fully set forth herein.

34.    At all times relevant, GREENWICH was a named insured under the terms and conditions of the ADMIRAL Policy.

35.    The Underlying Action alleges that the plaintiffs in the Underlying Action sustained Bodily Injury as that term is defined in the ADMIRAL Policy.

36.    The Underlying Action also alleges the bodily injury occurred during the Policy period of the ADMIRAL Policy, *i.e.* September 11, 2001 and continuing.

37.    The Underlying Action also alleges negligent acts or omissions by the defendants in the Underlying Action, including their failure to provide the plaintiffs with an appropriate protective device and safety measures and equipment, in purported violation of the New York State labor law and New York State common law of negligence.

38.    No exclusion in the ADMIRAL Policy places the allegations in the Underlying Action solely and entirely within the exclusory provisions in the ADMIRAL Policy.

39.    Because it is possible that GREENWICH may be held liable for some act or omission covered by the ADMIRAL Policy, ADMIRAL owes GREENWICH the duty to defend it in the Underlying Action.

40.    Plaintiff GREENWICH made a timely demand upon ADMIRAL under and pursuant to the terms and conditions of the Policy to defend and indemnify GREENWICH in the Underlying Action.

41.    Plaintiff GREENWICH has duly performed all of the conditions of the ADMIRAL Policy, on its part to be performed, if any, except as executed by waiver or estoppel on the part of the Defendant ADMIRAL.

42.    Defendant ADMIRAL wrongfully denied GREENWICH's claim and refused to defend and indemnify GREENWICH in the Underlying Action.

43.     Defendant ADMIRAL breached the terms and conditions of the Policy, including but not limited to the Insuring Agreement which states that ADMIRAL "will have the right and duty to defend [GREENWICH] against any 'suit'...."

44.     By virtue of the foregoing, ADMIRAL owes a duty to defend and indemnify Plaintiff GREENWICH under the terms and conditions of the ADMIRAL Policy.

## AS AND FOR A SECOND CAUSE OF ACTION

45.     Repeats and realleges each and every allegation set forth in paragraphs 1 though 44, inclusive of this Declaratory Judgment Complaint with the same force and effect as if more fully set forth herein.

46.     At all times relevant, GREENWICH was an additional insured under the terms and conditions of the TIG Umbrella Policy.

47.     The Underlying Action alleges that the plaintiffs in the Underlying Action sustained Personal Injury as that term is defined in the TIG Umbrella Policy.

48.     The Underlying Action also alleges the Personal Injury occurred during the Policy period of TIG's Umbrella Policy, *i.e.* September 11, 2001 and continuing.

49.     The Underlying Action also alleges negligent acts or omissions by the defendants in the Underlying Action, including their failure to provide the plaintiffs with an appropriate protective device and safety measures and equipment, in purported violation of the New York State labor law and New York State common law of negligence.

50.     No exclusion in the TIG Umbrella Policy places the allegations in the Underlying Action solely and entirely within the exclusory provisions in the TIG Umbrella Policy.

51.     Because it is possible that GREENWICH may be held liable for some act or omission covered by the TIG Umbrella Policy, TIG owes a duty to defend Plaintiff GREENWICH in the Underlying Action.

52.     Plaintiff GREENWICH made a timely demand upon TIG under and pursuant to the terms and conditions of the Umbrella Policy to defend and indemnify GREENWICH in the Underlying Action.

53.     Plaintiff GREENWICH has duly performed all of the conditions of the TIG Umbrella Policy, on its part to be performed, if any, except as executed by waiver or estoppel on the part of the Defendant TIG.

54.     Defendant TIG wrongfully denied GREENWICH's claim and refused to defend and indemnify GREENWICH in the Underlying Action.

55.     Defendant TIG breached the terms and conditions of the Umbrella Policy by wrongfully declining coverage under the TIG Umbrella Policy.

56.     By virtue of the foregoing, TIG owes a duty to defend and indemnify Plaintiff GREENWICH under the terms and conditions of the TIG Umbrella Policy.

## AS AND FOR A THIRD CAUSE OF ACTION

57.     Repeats and realleges each and every allegation set forth in paragraphs 1 though 56, inclusive of this Declaratory Judgment Complaint with the same force and effect as if more fully set forth herein.

58.     At all times relevant, GREENWICH was an additional insured under the terms and conditions of the TIG Excess Umbrella Policy.

59.     The Underlying Action alleges that the plaintiffs in the Underlying Action sustained Personal Injury as that term is defined in the TIG Excess Umbrella Policy.

22

60.    The Underlying Action also alleges the Personal Injury occurred during the Policy period of TIG's Excess Umbrella Policy, *i.e.* September 11, 2001 and continuing.

61.    The Underlying Action also alleges negligent acts or omissions by the defendants in the Underlying Action, including their failure to provide the plaintiffs with an appropriate protective device and safety measures and equipment, in purported violation of the New York State labor law and New York State common law of negligence.

62.    No exclusion in the TIG Excess Umbrella Policy places the allegations in the Underlying Action solely and entirely within the exclusory provisions in the TIG Excess Umbrella Policy.

63.    Because it is possible that GREENWICH may be held liable for some act or omission covered by the TIG Excess Umbrella Policy, TIG owes a duty to defend Plaintiff GREENWICH in the Underlying Action.

64.    Plaintiff GREENWICH made a timely demand upon TIG under and pursuant to the terms and conditions of the Excess Umbrella Policy to defend and indemnify GREENWICH in the Underlying Action.

65.    Plaintiff GREENWICH has duly performed all of the conditions of the TIG Excess Umbrella Policy, on its part to be performed, if any, except as executed by waiver or estoppel on the part of the Defendant TIG.

66.    Defendant TIG wrongfully denied GREENWICH's claim and refused to defend and indemnify GREENWICH in the Underlying Action.

67.    Defendant TIG breached the terms and conditions of the Policy by wrongfully declining coverage under the TIG Excess Umbrella Policy.

68.    By virtue of the foregoing, TIG owes a duty to defend and indemnify Plaintiff GREENWICH under the terms and conditions of the TIG Excess Umbrella Policy.

### AS AND FOR A FOURTH CAUSE OF ACTION

69.    Repeats and realleges each and every allegation set forth in paragraphs 1 though 68, inclusive of this Declaratory Judgment Complaint with the same force and effect as if more fully set forth herein.

70.    At the time or prior to the issuance of the ADMIRAL Policy, the TIG Umbrella Policy, and the TIG Excess Umbrella Policy, the Plaintiff and the Defendants contemplated that if GREENWICH may be held liable for some act or omission covered by each of the above identified policies of insurance, then the Defendants owed Plaintiff a duty to defend it in that suit.

71.    At the time or prior to the issuance of the ADMIRAL Policy, the TIG Umbrella Policy, and the TIG Excess Umbrella Policy, it was foreseen by or should have been foreseen by the Plaintiff and the Defendants, that Plaintiff GREENWICH would incur attorneys' fees and costs to compel Defendants to comply with their contractual duty to defend and indemnify Plaintiff.

72.    GREENWICH reasonably expected that the Defendants would fulfill this duty and promise, which was contemplated at or prior to the issuance of each of the above identified insurance policies.

73.    Defendants ADMIRAL and TIG breached their covenant of good faith and fair dealing by wrongfully declining to defend and indemnify Plaintiff GREENWICH.

74.    By virtue of the foregoing, Plaintiff is entitled to consequential damages, including attorneys' fees and costs expended by Plaintiff in contesting the Defendants' wrongful refusal to defend and indemnify GREENWICH.

**WHEREFORE**, Plaintiff GREENWICH prays as follows:

A.    For judgment on the first cause of action against Defendant ADMIRAL INDEMNITY COMPANY holding that ADMIRAL owes a duty to defend and indemnify GREENWICH under the terms and conditions of the ADMIRAL Policy;

B.    For judgment on the second cause of action against Defendant TIG INSURANCE COMPANY holding that TIG owes a duty to defend and indemnify GREENWICH under the terms and conditions of the TIG Umbrella Policy;

C.    For judgment on the third cause of action against Defendant TIG INSURANCE COMPANY holding that TIG owes a duty to defend and indemnify GREENWICH under the terms and conditions of the TIG Excess Umbrella Policy;

D.    For judgment on the fourth cause of action against Defendants ADMIRAL INDEMNITY COMPANY and TIG INSURANCE COMPANY for consequential damages, including attorneys' fees, and costs;

E.    For whatever and further relief the Court deems just and proper, including costs and disbursements of this action; and

F.    Plaintiff in the above-entitled action demands a trial by jury as to each and every cause and defendant.

Dated:   New York, New York
         July 21, 2008

                                    NICOLETTI HORNIG & SWEENEY
                                    *Attorneys for Plaintiff 120 Greenwich*
                                    *Development Associates, L.L.C.*

                          By:   _____
                                    John A.V. Nicoletti (JN-7174)
                                    Wall Street Plaza
                                    88 Pine Street, 7th Floor
                                    New York, New York 10005-1801
                                    Tel:    (212) 220-3830
                                    Fax:    (212) 220-3780
                                    Email: jnicoletti@nicolettihornig.com
                                    Our File: 00000792 JAVN/NN

X:\Public Word Files\0\792\legal\FINAL.7.21.08.doc

26